**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **ESTATE OF JEFFREY K. RUSSELL**, *by and through personal representative Kenley R. Gardner*, | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **Case No.: 1:15-CV-1080-VEH** |
| **CITY OF ANNISTON, SHANE DENHAM, GREG FEAZELL, WILLIAM WORTHAM, RANDY GARNER, and JAMES CAMPBELL,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

---

## MEMORANDUM OPINION

### I.  Introduction and Procedural Background.

This case stems from the tragic death of Jeffery K. Russell ("Mr. Russell"), who committed suicide in a jail cell at the City of Anniston jail after being arrested on February 20, 2014.

On June 26, 2015, the Estate of Jeffery K. Russell, by and through personal representative Kenley R. Gardner ("Plaintiff"), filed a complaint (the "Initial Complaint") against the City of Anniston, Shane Denham ("Defendant Denham"), Greg Feazell ("Defendant Feazell"), Nick Bowles ("Defendant Bowles"), and

Fictitious Defendants A, B, and C. On July 21, 2015, the Named Defendants[1] filed their answer, and on August 4, 2015, this action was reassigned to the undersigned. (Docs. 6, 9). On February 25, 2016, the Named Defendants filed an Amended Answer in order to assert new affirmative defenses. (Doc. 13).

On February 29, 2016, Plaintiff filed an amended complaint (Doc. 14, the "Amended Complaint"). On October 7, 2016, the Named Defendants filed a Motion for Leave To File Answer to Amended Complaint Out of Time, (doc. 22), and on October 10, 2016, the Named Defendants filed a Motion for Summary Judgment. (Doc. 23). After the Court granted leave to file an answer to the Amended Complaint and termed the Motion for Summary Judgment as moot, the Named Defendants filed their Answer on October 25, 2016. (Doc. 28).

On November 9, 2016, the Named Defendants re-filed their Motion for Summary Judgment (doc. 31, the "Motion") and brief in support (doc. 32). On November 30, 2016, Plaintiff filed a response, and on December 5, 2016, the Named Defendants filed their reply. (Docs. 38, 39).The Motion for Summary Judgment is ripe for this Court's disposition.

---

[1] The City of Anniston, Defendant Denham, Defendant Feazell, and Defendant Bowles answered the complaint jointly. However, Defendant Bowles was dismissed from this action *pro tanto* on October 7, 2016. (Doc. 21). Accordingly, the "Named Defendants" hereinafter refers to the City of Anniston, Defendant Denham, and Defendant Feazell.

## II.     Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 2265 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted).

The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings in answering the movant.[2] *Id.* at 324, 106 S. Ct. at 2553. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a

_____

[2] When *Celotex* was decided, FED. R. CIV. P. 56(e) encompassed this express requirement, but now this concept is covered by the language provided for under FED. R. CIV. P. 56(c).

genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d. 202 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249, 106 S. Ct. at 2511.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a

directed verdict if not controverted at trial. *Id.* (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16. First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358, 116 S. Ct. 2174, 2183, 135 L. Ed. 2d 606 (1996).

The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this

occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a

directed verdict at trial on the material fact sought to be negated. *Id.*

## III.  Statement of Facts.[3]

On February 20, 2014, Mr. Russell was arrested and taken to the City of

Anniston jail. AF Nos. 1-4.[4] When he was brought in for booking, Mr. Russell was

---

[3]  Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (at summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact but rather is provided simply to place the Court's legal analysis in the context of this particular case or controversy. *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).

The facts set out herein are based in substantial part on the facts proffered by the parties. To the extent that a party has proffered an undisputed fact, it has been included. To the extent that a proffered fact was disputed, the Court examined the proffered fact to determine whether the evidence cited in support actually supported the fact as stated. If it did not, the fact was not included. If it did, the Court then looked to whether the evidence cited in support of the dispute actually established a dispute. If it did not, the Court presented the fact as proffered, with citation to the evidence supporting the proffered fact. If the evidence did support a dispute, the fact was cast in the light most favorable to the non-movant. If more explanation was needed, the Court included that information in an appropriate footnote. Some facts proffered by the parties, which the Court deemed irrelevant or immaterial, may have been omitted.

[4]  The designation "AF" stands for admitted fact and indicates a fact offered by the Named Defendants that they have adequately supported through citations to underlying evidence. The Court's numbering of admitted facts (*e.g.*, AF No. 1) corresponds to the numbering of the Named Defendants's factual background as set forth in Doc. 32. A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.

Plaintiff objects to the first four facts offered by the Named Defendants as inadmissible hearsay because they are based on a police report of Mr. Russell's arrest that was neither authenticated nor offered as an exhibit in support of their Motion. (Doc. 38 at 6-7). The Named Defendants respond that the information gleaned from the police report on Mr. Russell's arrest "was offered as background to explain Russell's presence at the jail and various police officers'

wearing black pants, a blue shirt, and a necktie. AF. No. 5.[5] Anniston Police

Department Officer Jay Skinner ("Officer Skinner")[6] began the booking process,

and Corrections Officer Randy Garner ("Officer Garner") was also present in the

booking area. AF No. 6.1.[7]

    It is undisputed that the City of Anniston was responsible for Mr. Russell's

---

contact with Russell." (Doc. 39 at 4). The Court finds that these facts are irrelevant and are not a basis for this Court's decision one way or another; accordingly, the Court has not included them. However, neither party disputes that Mr. Russell was taken to the City of Anniston jail after his arrest.

    [5] Plaintiff also objects to AF. No. 5 as inadmissible hearsay based on the same police report as the first four proffered facts. The Named Defendants have supported AF. No. 5 with a citation to the deposition testimony of Mr. Feazell. (Doc. 31-3 at 71). However, at the cited point in his deposition, Mr. Feazell was referring not to a police report but rather to a videotape of Mr. Russell's booking that he had reviewed prior to his deposition testimony. (*See id.* at 70:13-14 and 71:11-16). Plaintiff has made no specific objection to Mr. Feazell's reliance on this videotape; accordingly, Plaintiff's objection to AF. No. 5 is overruled.

    [6] Officer Skinner is not a party to this litigation.

    [7] Plaintiff has objected to AF No. 6. in a vague and general manner, which violates Appendix II of this Court's Uniform Initial Order. (Doc. 10). Appendix II provides:

> The first section [of a brief in response to a motion for summary judgment] must consist only of the non-moving party's disputes, if any, with the moving part's claimed undisputed facts. The non-moving party's response to the moving party's claimed undisputed facts shall be in *separately numbered paragraphs* that coincide with those of the moving party's claimed undisputed facts. Any statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based. *All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*

(Doc. 10 at 17) (emphasis in original). Plaintiff has failed to specify which portion of the disputed deposition testimony is speculative. Accordingly, his objection to AF No. 6 is overruled.

welfare and safety when he was brought to the jail. AAF Nos. 39, 53.[8] Under the

City's written policy, the arresting officer is responsible for part of the booking

process, including (1) entering information into the system to complete an arrest

report; (2) taking and inventorying an inmate's property; and (3) completing a

medical questionnaire for the inmate. AF No. 7.1.[9] While the arresting officer

would complete the "medical screening" portion of the prisoner's medical intake

form, jail personnel would later complete the "medical intake" portion of the form.

AF. No. 8.1. The purpose of the medical intake questionnaire is to gather

information to identify and protect the medical or mental health needs of the

inmates. AAF No. 41. The answers on the medical intake form are based both on

---

[8] In his response (doc. 38) to the Motion for Summary Judgment, Plaintiff has proffered thirty-one additional facts. The Named Defendants only specifically disputed one of these additional facts in their reply brief (doc. 39). Therefore, the undisputed facts are also deemed to be admitted in accordance with Appendix II of the Court's Uniform Initial Order, to the extent that they are relevant. The Court's numbering of these additional admitted facts (*e.g.,* AAF No. 32) corresponds to the numbering of the facts as set forth in the response brief.

[9] In AF No. 7.2, the Named Defendants have proffered the following fact: "[Officer] Skinner had also been trained on the booking process as it relates to removing personal items from inmates." (Doc. 32 at 4). Plaintiff has objected to AF No. 7.2 pursuant to Rule 56(c)(2), which provides that a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2). "On motions for summary judgment, [the Court] may consider only that evidence which can be reduced to an admissible form." *Rowell v. BellSouth Corp.*, 433 F.3d 794, 800 (11th Cir. 2005) (citing *Macuba v. Deboer*, 193 F.3d 1316, 1324-25 (11th Cir. 1999)). Plaintiff has properly objected to AF No. 7.2 by pointing to a specific section of the deposition testimony of Nick Bowles ("Defendant Bowles"). (Doc. 38 at 8). The Named Defendants have not attempted to counter this specific objection; accordingly, this proffered fact has been excluded.

the involved officers' personal observations and the inmate's answers to those questions. AF No. 8.2.

When they filled out an inmate's medical intake questionnaire, correctional officers are to assess whether an inmate might be a "special needs inmate," which includes those individuals who (1) exhibit erratic behavior; (2) exhibit obvious signs of mental problems; (3) exhibit obvious physical problems; or (4) verbally threaten suicide. AF No. 26.2, 26.3. However, the City has no specific training to recognize "special needs inmates." AAF No. 52.

In Mr. Russell's case, the front page of the medical screening questionnaire indicated that he was in touch with reality, was capable of responding to questions, was not under the influence of drugs or alcohol, had never threatened or attempted suicide, and did not threaten or attempt suicide during the booking process. AF. No. 9.1. The questionnaire listed Mr. Russell's prior health conditions as "septic shock, kidney failure and kidney stones" and noted that he was "a diabetic and require[d] insulin injections." AF No. 9.2. The back page of the form indicated that Mr. Russell had no mental illness and had never threatened or attempted suicide. AF No. 9.3.

Mr. Russell was not considered a special needs inmate, and he did not indicate to anyone at the Anniston Police Department that he was suicidal in any

way. AF Nos. 27, 30. Officer Campbell testified that "[a]t no time, during the period of Mr. Russell's incarceration and prior to his death, did I notice Mr. Russell acting erratically or in any way which would have led me to believe that he was under the influence of alcohol or drugs, mentally unstable, physically disabled, depressed, and/or suicidal." AF No. 31.[10]

Officer Skinner completed his portion of Mr. Russell's booking process, including the front page of the medical intake form, and took Mr. Russell to a bench outside of the jail's control room. AF No. 10.1. Officer Skinner did not take Mr. Russell's tie from him during the initial booking process. AF No. 10.2. At the time of Mr. Russell's arrest, a tie was a very unusual item of apparel for an arrestee to be wearing when booked into the City of Anniston jail.[11]

---

[10] Plaintiff objects to AF No. 31 as inadmissible because there is no evidence that Officer Campbell is "competent though education, skill, or training to determine that Russell was not 'mentally unstable...depressed and/or suicidal.'" (Doc. 38 at 9-10). However, as the Named Defendants point out in their reply, Officer Campbell's statement (which the Court has set out in full as AF No. 31) merely reflects his observations, based on personal knowledge, of Mr. Russell's demeanor and appearance in order to demonstrate his lack of notice. (Doc. 39 at 5-6). Officer Campbell has not attempted to offer any expert opinion concerning mental illness or suicidal tendencies. Accordingly, Plaintiff's objection to AF No. 31 is overruled.

[11] Plaintiff objected to AF No. 10.3 as supported by nonexistent evidence. However, the Named Defendants in reply stated that AF No. 10.3 contained a typographical error and then cited to the correct, corresponding portion of the record. (Doc. 39 at 5). In his deposition, Defendant Feazell was asked the following:

Q: [D]o you recall ever having arrested anybody that was wearing a tie?

A: No.

After an arresting officer completes his part of the booking process, an inmate is typically turned over to a member of the jail staff, a corrections officer, or a corrections sergeant. AF No. 11.1.[12] It is the policy of the City of Anniston to escort inmates to their cells and lock the inmates into their cells. AAF No. 32. It is also the policy of the City of Anniston that inmates be divested of any items, including belts and shoestrings, that an inmate could use to harm him or herself. AAF Nos. 33, 42. The City of Anniston jail does not have a designated changing area for inmates; therefore, arrestees might change into inmate clothing in their individual cells, the padded cell, or the print photograph room. AF No. 16. The City of Anniston does not have a written policy that inmates are to change into

---

> Q: Okay. Would you consider that to be a very unusual item of apparel someone has on when they are arrested?
>
> A: Yes. In fact, I – thinking back, I can never remember[] anybody coming in with a tie.

(Doc. 31-3 at 118:12-19). Accordingly, the Named Defendants have substantiated their proffered fact, and Plaintiff's objection to AF No. 10.3 is overruled.

[12] Plaintiff objected vaguely and collectively to AF Nos. 11-29 as follows:

> The Plaintiff objects generally to Paragraphs 11-29 as being support[ed] by inadmissible speculation contained in the evidentiary material. The paragraphs rely upon deposition testimony that contains inadmissible evidence based on speculation and hearsay.

(Doc. 38 at 9). As with AF No. 6, this general statement violates this Court's Uniform Initial Order's requirement that disputed facts be followed by a specific reference to the disputed portion of the evidentiary record. Accordingly, Plaintiff's objections to AF. Nos. 11-29 are overruled.

clothing inside their jail cells, nor does it have a written policy mandating that corrections officers be present when inmates change clothes. AAF Nos. 34, 35, 49, 50.

Mr. Russell was fingerprinted and photographed by James Campbell ("Officer Campbell"). AF No. 13. Officer Campbell then took Mr. Russell, who was still wearing his black pants, blue shirt, and necktie, to cell A-2, where he changed into his inmate attire. AF Nos. 14, 15.1. Officer Campbell was not present when he changed. AF No. 15.2. After Mr. Russell changed, Officer Campbell retrieved his personal clothing but failed to ensure that the tie was in his personal property. AF No. 18.1; AAF No. 47.[13] Though Officer Campbell had been trained to secure all personal belongings after an arrestee changed into jail-issued clothes, Officer Campbell did not notice that Mr. Russell had kept the tie after changing. AF No. 18.2-18.3. There were multiple opportunities for Mr. Russell to have been searched before he committed suicide. AAF No. 45.

On the morning of February 21, 2014, at 9:01 a.m., Mr. Russell was found dead in his cell by a fellow inmate. AF No. 19.1. He had hanged himself with the necktie that Officer Campbell had overlooked when retrieving Mr. Russell's

---

[13] The City of Anniston does not dispute that Mr. Russell's tie should have been taken from him before he went into his jail cell. AAF Nos. 48, 62.

personal clothing. AF No. 19.2; AAF No. 44. Approximately an hour prior to Mr. Russell's suicide, Corrections Officer William Wortham ("Officer Wortham") had performed an inmate check on Mr. Russell. AF No. 20.1; AAF No. 56. When he did so, Mr. Russell asked Officer Wortham to come back and talk to him, which he agreed to do after completing his rounds. AF No. 20.2.; AAF No. 57. After Officer Wortham finished his rounds and was back in the control room, Mr. Russell "buzzed in" and asked to speak to Defendant Feazell.[14] AF No. 20.3; AAF No. 58. Mr. Russell was told that Defendant Feazell was out of the building but would speak to Mr. Russell when he returned. AF Nos. 20.4, 23.1; AAF No. 59.

No correctional officer went to check on Mr. Russell after he asked to speak with Officer Wortham and Defendant Feazell. AAF Nos. 60, 61. Mr. Russell was last seen alive at approximately 8:48 a.m., thirteen minutes before he was discovered by the fellow inmate. AF No. 21. When Defendant Feazell returned to the jail between 8:45 a.m and 9:00 a.m, he heard a commotion, walked over to the A-section of the jail, and met Officer Wortham, who informed him that Mr. Russell had hanged himself. AF No. 23.2.

---

[14] In February 2014, Defendant Feazell was a lieutenant with the administrative division of the Anniston Police Department. He served as assistant division commander and jail administrator and was responsible for jail operations. Additionally, if the division commander was not present, Defendant Feazell would also supervise dispatchers and clerks. AF No. 22.

In February 2014, the City of Anniston Police Department had a written Standard Operating Procedures Manual (the "S.O.P. Manual"), which included written policies regarding the arrest, intake, booking, processing, and incarceration of individuals. AF No. 32. Pursuant to the City of Anniston's policies and standard operating procedures, correctional officers were asked to do inmate checks "as often as possible." AF No. 25.1. Although there was no written policy requiring inmate checks at certain frequencies, it was highly recommended that checks be done at least on an hourly basis. AF No. 25.2; AAF No. 43.

As of the date of his deposition on August 18, 2016, Officer Bowles[15]

---

[15] Plaintiff has attempted to offer the following as an additional undisputed fact: "Nick Bowles, the person in charge of training corrections officers at Anniston's municipal jail[,] is unsure how the corrections officers are trained ([Doc. 31-1] at 15:1-2)." (Doc. 13 at 13). However, Officer Bowles actually stated the following during his deposition:

> Q: To your knowledge, had Sergeant Campbell been trained on the proper procedure to make sure that inmates did not take personal property into a jail cell?
>
> A: I would – that would be asking me to assume his training, and I do not know how they're trained.
>
> Q: Who would be in charge of his training as a corrections officer?
>
> A: The jail lieutenant would ensure he was trained, and he would be trained by senior corrections officers.

(Doc. 31-1 at 14:20-15:6). The Named Defendants have objected on the basis that Officer Bowles "was not responsible for training the corrections officers. Rather, Feazell, as the designated jail lieutenant, was responsible for this training...[t]hus, it is unexceptional and unremarkable that Bowles would not be familiar with that training, since he was not, in actuality, responsible for it." (Doc. 39 at 6-7). The Court finds the Named Defendants' point well-taken and determines that Bowles' lack of familiarity is irrelevant as he is no longer a party to this

testified that, to his knowledge, there had not been another suicide at the City of Anniston jail since he began working for the City in 2000. AF No. 29. An investigation into Mr. Russell's suicide revealed two violations of policy. AAF No. 54. Officer Garner received a reprimand because he entered Mr. Russell's personal property list into the computer and should have "double checked" that all of Mr. Russell's property was present. AF No. 6.2.

## IV.    Analysis.

### A.    <u>Abandoned Claims</u>

In this prison suicide case, Plaintiff asserts claims against all defendants pursuant to 42 U.S.C. § 1983, Section 504 of the Rehabilitation Act of 1973 (the "RA"), and Title II of the Americans with Disabilities Act (the "ADA"). In their Motion, the Named Defendants have moved for summary judgment as to all claims brought against them. (Doc. 31). However, in his response brief, Plaintiff devotes a mere three pages of legal argument to the Section 1983 claims brought against the City of Anniston and does not even mention any Section 1983 claims asserted against Defendants Denham and Feazell. Furthermore, Plaintiff failed to respond in support of his RA and ADA claims against <u>any</u> of the Named Defendants.

action. Accordingly, AAF No. 55 has been excluded.

Thus, in his opposition, Plaintiff has abandoned any claim brought against Defendants Denham and Feazell; any claim brought pursuant to the RA against any defendant; and any claim brought pursuant to the ADA against any defendant. *See, e.g.*, *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned when argument not presented in initial response to motion for summary judgment); *Bute v. Schuller Int'l, Inc.,* 998 F. Supp. 1473, 1477 (N.D. Ga. 1998) (finding unaddressed claim abandoned); *see also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("We decline to exercise our discretion to entertain this argument which was not fairly presented to the district court."); *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (failure to brief and argue issue at the district court is sufficient to find the issue has been abandoned); *McMaster v. United States,* 177 F.3d 936, 940-41 (11th Cir. 1999) (claim may be considered abandoned when district court is presented with no argument concerning a claim included in the plaintiff's complaint).

Accordingly, the Motion is due to be **GRANTED** as to all claims brought against Defendants Denham and Feazell in any count as well as to the ADA and RA claims in Count III of the Amended Complaint.

B.    **Claims Against the City of Anniston**

16

The only claims that Plaintiff has not completely abandoned are two Section 1983 claims against the City of Anniston for allegedly (1) failing to enact or enforce policies or customs to prevent inmate suicide and (2) failing to properly train its police and correctional officers on suicide prevention procedures. (Doc. 38 at 14-16).

### 1. *Policy and Custom Claim*

First, it is well established that the City of Anniston cannot be held liable for the actions of its employees through the theory of *respondeat superior* because "a municipality cannot be held liable *solely* because it employs a tortfeasor[.]" *Monell v. Dept. of Social Services of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036, 56 L. Ed. 2d 611 (1978) (emphasis in original).

Rather, before a municipality can be held accountable for the conduct of a police or correctional officer, a plaintiff must show that the execution of the local government's "policy" or "custom" was the cause of the injury. *Id.* at 694. In other words, "[a] local government may be held liable under § 1983 only for acts for which it is actually responsible, 'acts which the [local government] has officially sanctioned or ordered.'" *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1287 (11th Cir. 1998) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986)).

Consequently, there must not only be fault on the part of the municipality in

enacting or tolerating a specific policy or custom, but "there also must exist a causal link between the custom or policy and the deprivation." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1986) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 819 (1985)). In this case, Plaintiff must establish that there was a strong likelihood, rather than a mere possibility, that Mr. Russell would commit suicide in his cell. *See Heggs v. Grant*, 73 F.3d 317, 320 (11th Cir. 1996) (quoting *Tittle v. Jefferson Cty. Comm'n*, 10 F.3d 1535, 1540 (11th Cir. 1994)) ("There can be no deliberate indifference to an inmate's safety, however, unless there was a 'strong likelihood, rather than a mere possibility, that suicide would result from a defendant's actions or inaction.'").

Plaintiff alleges that the City of Anniston "made a deliberate choice to follow a course of action of allowing inmates to take personal items into jail cells without supervision of corrections officers." (Doc. 38 at 15). Defendants, in turn, rely on *Williams v. Lee Cty., Ala.*, 78 F.3d 491, 493 (11th Cir. 1996), where the Eleventh Circuit affirmed the granting of summary judgment in a Section 1983 action against a county and sheriff relating to a prison suicide. In *Williams*, the defendants had suicide prevention procedures in place, including suicide policies in a staff training manual and monitoring procedures to evaluate inmate mental health. *Id.* The Eleventh Circuit determined that the policies in question survived

constitutional scrutiny and that clarity in hindsight as to steps that could have been taken was insufficient to establish deliberate indifference. *Id*.

It is undisputed that the City of Anniston's S.O.P. Manual required removal of all personal possessions, including belts and shoestrings, that an inmate could use to harm him or herself. The written policy therefore included measures that squarely addressed the risk of inmate suicide. Although the written policy did not explicitly reference the need to remove *neckties*, it would be unreasonable to expect a municipal procedural manual to set out each and every type of item which an inmate could potentially use as a tool for self-harm. The omission of a reference to neckties in the S.O.P. Manual simply does not amount to deliberate indifference.

Further, Defendant Feazell's hindsight opinion that it might "be a good idea" to put in place a written policy requiring correctional officers to be present when an inmate changes clothes similarly fails to establish deliberate indifference. (Doc. 31-3 at 77:14-17). *See Williams*, 78 F.3d at 493 ("We have found less formal means of suicide prevention than those of Lee County to pass constitutional muster. While Plaintiff's experts did testify from hindsight concerning steps that might have been taken to prevent Williams' suicide, 'these alleged weaknesses, without more, do not amount to a showing of deliberate indifference[.]'" (citations

omitted).

Moreover, at the time of Mr. Russell's arrest, formal, written procedures were in place to evaluate his risk for suicide. Like in *Williams*, "procedures were in place for evaluating inmates for mental health problems, including potential suicide victims." 78 F.3d at 491. Mr. Russell's medical screening questionnaire indicated that he had no history of threatening or attempting suicide. Further, the questionnaire suggests that he did not appear suicidal at any point in time during the booking process. In fact, there is no evidence that Mr. Russell acted in a dangerous, erratic, or self-harming manner in any way prior to his suicide.

Lastly, to the extent that Plaintiff attempts to base his policy or custom claim on the lack of direct supervision of Mr. Russell, this claim also fails to pass constitutional muster. The Eleventh Circuit has made clear that policies mandating continuous supervision of inmates are not constitutionally required, particularly when the inmate has demonstrated no elevated level of suicide risk. *See Popham v. City of Talladega*, 908 F.3d 1561, 1565 (11th Cir. 1990) (dismissing a deliberate indifference claim based on lack of constant supervision when the prisoner was not known to have previously threatened or attempted suicide); *Williams*, 78 F.3d at 491 (rejecting Section 1983 claim against county and sheriff where inmate was left alone for fifteen to twenty minutes soon after he threatened suicide); *cf.*

*Sanders v. Howze*, 177 F.3d 1245 (11th Cir. 1999) (rejecting deliberate indifference claim where inmate, who had recently attempted suicide, committed suicide after being left alone with a bed sheet and visually monitored every half hour).

The S.O.P. Manual for the City of Anniston Police Department specifically directed correctional officers to check on inmates as often as possible, and custom dictated that correctional officers conduct inmate checks on an hourly basis at a minimum. These monitoring procedures tend to disprove deliberate indifference and shift the burden of producing contrary evidence to the Plaintiff. Plaintiff, in turn, has failed to meet his burden of establishing a causal link between the City's policies or customs and Mr. Russell's suicide.

Keeping in mind that "[t]he mere opportunity for suicide, without more, is clearly insufficient to impose liability on those charged with care of prisoners," the Court finds that Plaintiff has failed to show that a deficiency in either the City's policies on inmate clothing changes or its inmate monitoring policies created a strong likelihood, rather than a mere possibility, of suicide. Accordingly, Defendants' Motion is due to be **GRANTED** as to Plaintiffs' policy or custom claim against the City of Anniston.

2. *Failure To Train Claim*

Plaintiff has devoted less than a page of argument in his response brief to his contention that the City of Anniston should be held liable for failing to properly train its employees. Like his custom or policy claim, Plaintiff's failure to train claim is unsupported by evidence in the record at summary judgment.

One way to establish official municipal policy in the context of challenged police action is through deficient officer training. In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Supreme Court acknowledged that "there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability in § 1983[,]" and held that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388, 109 S. Ct. at 1204. The individual shortcomings of a police officer or even the negligent administration of an "otherwise sound program" are insufficient grounds for maintaining a § 1983 municipal claim. *Canton*, 489 U.S. at 390, 109 S. Ct. at 1206.

In addressing a failure to train as a custom or policy under § 1983, the Eleventh Circuit has clarified:

[o]nly when the failure to train amounts to "deliberate indifference" can

22

it properly be characterized as the "policy" or "custom" that is necessary for section 1983 liability to attach. *City of Canton*, 489 U.S. at 389, 109 S. Ct. at 1205. Failure to train can amount to deliberate indifference when the need for more or different training is obvious, *id.* at 390, 109 S. Ct. at 1205, such as when there exists a history of abuse by subordinates that has put the supervisor [or municipality] on notice of the need for corrective measures, *Greason*, 891 F.2d at 837, and when the failure to train is likely to result in the violation of a constitutional right, *City of Canton*, 489 U.S. at 390, 109 S. Ct. at 1205.

*Belcher v. City of Foley*, 30 F.3d 1390, 1397-98 (11th Cir. 1994). To sustain a claim for a failure to train, a plaintiff must plead facts showing "that it was *so* predictable that failing to train the [officers] amounted to [a] *conscious disregard* for [their constitutional] rights." *Connick v. Thompson*, 563 U.S. 51, 71, 131 S. Ct. 1350, 1365, 179 L. Ed. 2d 417 (2011) (emphasis in original).

The Eleventh Circuit has routinely rejected failure to train claims based on

"weakness in the screening process, the training of deputies and the supervision of prisoners." *Tittle*, 10 F.3d at 1540; *see Edwards*, 867 F.2d at 1277 (conduct by jail officials in leaving seemingly sleeping juvenile inmate, who had never threatened or attempted suicide and who had never been considered suicide risk, in secure cell for 45 minutes did not constitute deliberate indifference to inmate's safety from self-harm); *see also Hardin*, 52 F.3d at 938 (municipal liability unfounded where City personnel found not to have been deliberately indifferent to mental health needs of inmate who died from ingesting a bar of soap)*; Popham v. City of Talladega*, 908 F.2d 1561, 1564–65 (11th Cir.1990) (claim that decedent fit profile of high suicide risk which screening would have detected is insufficient to establish deliberate indifference); *Heggs v. Grant*, 73 F.3d 317 (11th Cir.1996) (holding that, at the time of Heggs' suicide, the law did not require shift supervisor to do anything differently even though Heggs was intoxicated at time of her arrest, had

previously been arrested for public drunkenness, denied ever having suicidal tendencies, but subsequently threatened to take her life and then retracted the threat as a joke); *Williams*, 78 F.3d at 493 (<u>training and monitoring procedures for suicide prevention described in evidence disproved deliberate indifference even though Sheriff's Department had information from probate court commitment order that inmate was mentally ill and posed a threat of substantial harm to himself and to others</u>).

*Brewer v. City of Daphne*, 111 F. Supp. 2d 1299, 1315-16 (S.D. Ala. 1999) (Steele, J.) (emphasis added).

First, there is no evidence that any assessment of Mr. Russell's mental health during the booking process was unreasonable. Jail personnel and arresting officers were taught to look for any erratic behavior, mental instability, or related physical ailments in an inmate, and they were trained to complete medical questionnaires that specifically questioned whether an inmate was potentially suicidal. Mr. Russell's medical questionnaire indicated that he had not exhibited any suicidal tendencies or other signs of mental illness. The record at summary judgment simply does not demonstrate that anyone at the City of Anniston jail believed that Mr. Russell was at serious risk of committing suicide.

Plaintiff also points to no documented history that City of Anniston correctional officers failed to take measures to prevent suicides or otherwise failed to adhere to training procedures. In fact, one officer testified that, to his

knowledge, no other suicides occurred at the City of Anniston jail between when he began his employment with the City in 2000 and Mr. Russell's suicide in 2014.

Even assuming, *arguendo*, that the failure to collect Mr. Russell's necktie along with the rest of his personal belongings amounted to deliberate indifference on an individual officer's part, there is insufficient evidence to establish any liability on the part of the City of Anniston, particularly given that the City's policies explicitly required that all items that could be used for self-harm be removed from an inmate's possession .

Plaintiff's conclusory and general reference to *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015), is unavailing, as *Brooks* is factually inapposite and legally distinguishable from this case. Although the Eleventh Circuit discussed deliberate indifference in the prison context in that case, the court was not faced with a failure to train claim against a municipality. Furthermore, *Brooks* concerned claims of deliberate indifference in the context of prison cell sanitary conditions rather than in the context of an inmate suicide.

Applying the law of this Circuit, no "clearly established law required [the City of Anniston] to staff the jail or train [its] officers more thoroughly under these circumstances." *Heggs*, 73 F.3d at 321. Accordingly, the Motion is also due to be **GRANTED** as to Plaintiffs' failure to train claim against the City of Anniston.

**V.    Conclusion.**

Based on the foregoing, the Named Defendants are entitled to summary

judgment as to all of Plaintiff's claims against them. By separate order, summary

judgment will be **GRANTED** in favor of the City of Anniston, Defendant

Denham, and Defendant Feazell.

**DONE** and **ORDERED** this the 23rd day of August, 2017.

**VIRGINIA EMERSON HOPKINS**
United States District Judge